## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ERICA ROBERTS,

        *Plaintiff*,

    v.

EUGENE SCALIA,
Secretary, U.S. Department of Labor,

        *Defendant*.

Civil Action No. 1:19-cv-00474 (CJN)

## MEMORANDUM OPINION

Plaintiff Erica Roberts, a former Department of Labor employee, alleges that her supervisors discriminated and retaliated against her on the basis of race, sex, and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*  *See generally* Compl., ECF No. 1.  The Secretary moves to dismiss, contending that the Court lacks subject matter jurisdiction over Roberts's claim that the Department failed to accommodate her disability under the Rehabilitation Act and that the rest of the Complaint fails to state a claim.  *See generally* Def.'s Mot. to Dismiss Pl.'s Compl. ("Mot."), ECF No. 8.  The Court has jurisdiction but agrees that the Complaint fails to state a claim and dismisses it in its entirety.

### I.     Background

Erica Roberts is an African-American woman who held a senior civil service position in the Office of the Assistant Secretary of Labor for Administration and Management.  Compl.

¶¶ 8, 22.[1]  She suffers from a number of debilitating medical conditions—a fact known to her supervisors as early as 2016.  *Id.* ¶¶ 10, 13–17, 20.  Roberts required several accommodations to enable her to perform her job's critical functions.  *Id.* ¶¶ 22–27.  She alleges that her supervisors were also aware of previous instances in which she had filed Equal Employment Opportunity complaints with the Department, though none of them had been the target of those complaints.  *Id.* ¶¶ 11–12.

Roberts volunteered and was selected for a temporary assignment from the Labor Department to the Environmental Protection Agency (EPA), which she began in October 2016.  *Id.* ¶ 28.  She excelled at the EPA, where she temporarily filled a Senior Executive Service-level position; the EPA even extended her assignment by a few months to continue to take advantage of her performance.  *Id.* ¶ 29.  While on detail, she communicated regularly with her supervisor at the Labor Department, Dennis Johnson.  *Id.* ¶¶ 9, 20–21, 40.  Roberts and Johnson did not get along well with one another; in the course of their communications during Roberts's absence, Roberts once informed Johnson that she found his behavior to be "offensive and belittling."  *Id.* ¶ 21.

As Roberts prepared to return to the Labor Department, she proposed to Johnson that her position be permanently transferred from the Office of Administration and Management to the Office of Public Affairs.  *Id.* ¶ 30.  Johnson was initially warm to the idea but later informed Roberts that no transfer would occur until the confirmation of a new Assistant Secretary, who would need to sign off on the move.  *Id.*  Roberts also mentioned to Labor officials during this

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must, of course, accept well pleaded facts in the Complaint as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

time that her medical condition was worsening, providing supporting medical documentation to the appropriate personnel. *Id.* ¶ 22.

Soon after Roberts returned to the Labor Department, Johnson informed her on September 21, 2017, that rather than transferring her position to another office, he had initiated a process to modify her job description and duties. *Id.* ¶¶ 31–31. Roberts objected to the changes and again informed Johnson that she "found his communication belittling." *Id.* ¶ 33. Unable to convince Johnson to change course, Roberts elevated her concerns to the Acting Deputy Assistant Secretary, Al Stewart. *Id.* ¶ 34. Fifteen days later, she went to human resources representative Shawn Hooper. *Id.* ¶ 35.

Hooper spoke with Johnson to get his side of the story on October 10. *Id.* ¶ 36. That same day, Johnson approached Roberts to harass her about going behind his back by contacting human resources; he expressed his intent to downgrade Roberts's annual performance evaluation by omitting any mention of her EPA detail and placing her in the "effective" performance category. *Id.* ¶¶ 37–38. Johnson told Roberts that if she had a problem with the evaluation, she could provide a written statement detailing her objections. *Id.* ¶ 42. Finally, Johnson mentioned that his own supervisor, Deputy Assistant Secretary for Operations Edward Hugler, had signed off on the change to Roberts's position description and that it was going into effect immediately. *Id.* ¶ 43. Roberts submitted written objections to the evaluation on October 17, 2017, but she never received a response from either Johnson or Hugler. *Id.* ¶¶ 42, 45.

Formal notification of the position modification arrived three days later. *Id.* ¶ 43. According to the Complaint, the new job was a poor fit for Roberts. Her previous job "required . . . interactions with high-ranking officials from several Federal agencies," but the new work consisted of menial data entry that "required only limited strategic thinking with no thought

leadership." *Id.* ¶ 52.  Roberts claims that she did "not possess the required expert knowledge and mastery described in the new position classification," which was mostly administrative in nature and similar to work performed by employees at the GS-13 pay grade—unsuited for Roberts's status as a GS-15 employee. *Id.* ¶¶ 52, 54, 58.  Finally, Roberts alleges that her health deteriorated further as a result of the stress and anxiety the ordeal induced, causing her to take medical leave to recover. *Id.* ¶ 59.

Roberts received a final copy of her performance evaluation on November 6, 2017. *Id.* ¶ 51.  It was signed by both Johnson and Hugler and, as expected, rated Roberts as "effective," making no mention of her EPA detail. *Id.* ¶¶ 39, 51.  Roberts alleges that Hugler "has a history of retaliating against 'trouble makers' and his refusal to adjust Plaintiff's performance was punishment for Plaintiff's prior [Equal Employment Opportunity] [c]omplaint." *Id.* ¶ 44.

The Complaint contains other allegations but does not tie them to particular dates or incidents.  They include claims that (1) Johnson "made [unspecified] disparaging comments about [Roberts] that reflect stereotypes associated with African Americans, such as referring to her as combative and questioning his decisions," *id.* ¶ 47; (2) that "Johnson worked to have Plaintiff reassigned, without her knowledge, to supervise the only [other] African-American [employee] in the office in a less visible administrative position," though it's unclear whether that reassignment corresponds to the change in Roberts's position description or whether Johnson ever succeeded in the reassignment, *id.* ¶¶ 48–49; (3) that "Johnson also displayed disparate treatment towards all female employees" by assigning them to "position[s] of less visibility and prominence" and giving them less preferential treatment in the assignment of private office spaces, *id.* ¶¶ 50, 57; and (4) that "Johnson was deliberately an[d] unnecessarily

slow to approve and/or respond to several requests for [unspecified disability] accommodations,"
*id.* ¶ 61.

## II.        Procedural History

On December 20, 2017, Roberts contacted the Labor Department's Civil Rights Center to

discuss the situation with an Equal Employment Opportunity counselor.  *Id.* ¶ 60; *see also*

Complaint Counseling History, ECF No. 8-2 at 2 (indicating date of initial contact).[2]  She filed

an informal complaint against Johnson and Hugler at that meeting.  *See generally* Pl.'s Informal

Compl. of Discrimination ("Informal Compl."), ECF No. 11-2 at 9–17.  After receiving

permission, Roberts filed a formal complaint on February 13.  *See generally* Pl.'s Formal Compl.

of Discrimination ("Formal Compl."), ECF No. 11-3 at 1–6.  The Civil Rights Center transferred

the complaint to the Department's Administrative Review Board after determining that it had an

internal conflict of interest.[3]  *See* Samuel Rhames, Jr.'s Ltr. of Apr. 9, 2018, ECF No. 11-3 at 10.

The Administrative Review Board accepted the complaint on May 14, 2018.  *See* Acting

Chief Admin. Appeals Judge Joanne Royce's Ltr. of May 14, 2018, ECF No. 8-2 at 5–6.  The

Board conducted an investigation and then transmitted the results to Roberts on August 14, 2018.

*See* Final Agency Decision of Nov. 27, 2018 ("Decision") at 1, ECF No. 8-2 at 8.  The Board

---

[2] In Title VII cases, courts may typically refer to administrative records of Equal Employment
Opportunity complaints, investigations, and adjudications for the limited purpose of determining
whether Plaintiff exhausted administrative remedies before suing without converting the Motion
to Dismiss into a Motion for Summary Judgment under Federal Rule of Civil Procedure 12(d).
*See Vasser v. McDonald*, 228 F. Supp. 3d 1, 9–10 (D.D.C. 2016).

[3] Although the letter does not specify the nature of the problem, the conflict likely arose around
Edward Hugler, who was a named target of the complaint.  As Deputy Assistant Secretary for
Operations, Hugler was responsible for oversight of the Civil Rights Center.  *See* Dep't of Labor,
*Office of the Assistant Secretary for Administration and Management Organization Chart*,
https://www.dol.gov/agencies/oasam/about (last visited April 15, 2020).

denied the complaint on November 27, 2018, concluding that Roberts had failed to prove any of her allegations. *Id.* at 2, ECF No. 8-2 at 9.

Roberts filed this suit on February 25, 2019. [4]  *See generally* Compl.  Her Complaint alleges three counts under Title VII:  (I) race discrimination, *id.* ¶¶ 62–65; (II) sex discrimination, *id.* ¶¶ 66–68; and (III) retaliation, *id.* ¶¶ 69–72.  Roberts also alleges two counts under the Rehabilitation Act:  (IV) disability discrimination, *id.* ¶¶ 73–76, and (V) retaliation, *id.* ¶¶ 77–80.  The various discrimination claims assert theories of both disparate treatment and hostile work environment.  *See generally* Compl.  In addition to those theories of liability, Count IV also alleges a failure to provide reasonable accommodation for Roberts's disabilities.  *Id.* ¶ 74.  Roberts seeks lost pay and benefits, reassignment to an appropriate position within the Department, money damages, attorney fees, costs, and other equitable relief.  *See, e.g.*, *id.* ¶ 65.

The Secretary moves to dismiss on several grounds.  *See generally* Mot.  First, he argues that Roberts failed to exhaust administrative remedies on her claims under the Rehabilitation Act, which deprives the Court of subject-matter jurisdiction to review Counts IV and V.  *See id.* at 10–12.  In the course of briefing, Roberts conceded that she failed to exhaust remedies on her claim for Rehabilitation Act retaliation and withdrew Count V, though she continues to press Count IV.  *See* Pl.'s Resp. to Def.'s Mot. to Dismiss ("Resp.") at 13, ECF No. 11.  Second, the Secretary argues that Roberts failed to exhaust her remedies under Title VII as to any alleged discriminatory act, with the exception of her November 6, 2017, performance evaluation.  *See id.*

---

[4] The Complaint named former Secretary Alexander Acosta as Defendant.  Secretary Scalia assumed the position on September 30, 2019, replacing Acosta.  On Defendant's Motion, the Clerk substitutes Scalia as Defendant under Federal Rule of Civil Procedure 25(d).  *See* Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. to Dismiss at 1 & n.1, ECF No. 13.

at 15–19.  Third, the Secretary contends that the remaining arguments fail to state a claim for relief for either discrimination or retaliation.  *See* Mot. at 12–15, 19–21.

### III.     Standard of Review

### A.     Jurisdiction

The Secretary's Motion first argues that the Court lacks jurisdiction over Roberts's claim for denial of reasonable disability accommodations under the Rehabilitation Act because Roberts failed to exhaust her administrative remedies on that claim.  *See* Mot. at 10–12.  Unlike in the Title VII context, the Rehabilitation Act's exhaustion requirement is jurisdictional in nature.  *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006) (citing 29 U.S.C. § 794a(a)(1) (limiting relief "to any employee . . . aggrieved by the final disposition of [an administrative] complaint.")).  The Secretary therefore properly raises that argument under Federal Rule of Civil Procedure 12(b)(1).  *See* Mot. at 8.  "[T]he party asserting federal jurisdiction . . . has the burden of establishing it," and the Court presumes that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v Geary*, 501 U.S. 312, 316 (1991)).

### B.     Failure to State a Claim

The Secretary moves to dismiss all other claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.  *See* Mot. at 8–9.  Under Title VII, exhaustion of remedies is not jurisdictional but is rather an affirmative defense raised under Rule 12(b)(6). *Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although the Court accepts all well pleaded facts in the Amended Complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  "While a complaint . . . does not need detailed factual allegations, a

plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do."  *Id.* at 554–55 (internal quotations omitted).  The claim to relief must be "plausible on its

face," enough to "nudge[ the] claims across the line from conceivable to plausible."  *Id.* at 570.

## IV.    Analysis

Rather than taking each count individually, the Secretary's Motion attacks the factual

allegations and procedural history of specific incidents that underlie nearly every count.  *See*

*generally* Mot.  The Court analyzes the issues roughly as the Parties frame them in their briefing.

### A.  Jurisdiction Over the Failure-to-Accommodate Claim

Count IV alleges disability discrimination under the Rehabilitation Act.  *See* Compl.

¶¶ 73–76.  The operative paragraph alleges:

> Defendant, through its agents or supervisors, unlawfully
> discriminated and denied Plaintiff's equal employment
> opportunities because of her disabilities when it denied her equal
> employment opportunities, *failed to provide her with reasonable*
> *accommodations*, imposed unwarranted transfers and other tangible
> adverse actions and created a hostile work environment in violation
> of the Rehabilitation Act.

Compl. ¶ 74 (emphasis added).  The Complaint is noticeably short on details regarding the

alleged failure to accommodate Roberts's disabilities; it lists several accommodations she needed

to perform her job's critical functions and then vaguely alleges that Johnson was "deliberately

an[d] unnecessarily slow to approve and/or respond to several requests for accommodation."  *Id.*

¶ 61; *see also id.* ¶¶ 26–27.  Roberts's briefing provides a bit more detail, stating that Roberts's

modified position description required her to perform duties that her disabilities precluded, such

as "considerable time typing or standing."  Resp. at 6 (citing Compl. ¶¶ 31–33).  The paragraphs

of the Complaint cited by Roberts contain no such allegations.  Compl. ¶¶ 31–33 (stating that Roberts "expressed concerns about the position description change").

The Secretary moves to dismiss any allegation of failure to accommodate a disability because, he claims, Roberts did not exhaust administrative remedies as to that issue.  Mot. at 10–12.  The Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her . . . disability, . . . be subjected to discrimination . . . under any program or activity conducted by any Executive agency."  29 U.S.C. § 794(a).  The Act incorporates the employment discrimination standards of the Americans with Disabilities Act. *Id.* § 794(d).  It also incorporates Title VII's administrative-exhaustion requirement and available remedies for federal employees.  *See id.* § 794a(a)(1) (incorporating 42 U.S.C. § 2000e-16). "For claims against federal agencies, exhaustion requires submitting a claim to the employing agency itself."  *Doak v. Johnson*, 798 F.3d 1096, 1099 (D.C. Cir. 2015).  "The obligation to initiate one's claim in the government agency charged with discrimination is 'part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel primary responsibility for maintaining nondiscrimination in employment.'" *Barkley v. U.S. Marshals Serv. ex rel Hylton*, 766 F.3d 25, 34 (D.C. Cir. 2014) (quoting *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir. 1983)).

Roberts's formal administrative complaint checked a box for disability discrimination but included no allegations regarding a denial of accommodations.  *See generally* Formal Compl.  In Box 6, which asks the complainant to "[s]pecify the action(s) that gave rise to this complaint," Roberts listed detailed allegations regarding her performance evaluation, denied opportunities to compete for promotion, the modification to her official duties, disparate treatment of African Americans in the office, and other complaints.  *Id.* at 2–4.  In Box 7, which directs the

complainant to "specify remedy(ies) you believe will resolve your complaint," Roberts asked for five different remedies, including reassignment, non-competitive appointment to the Senior Executive Service, and reimbursement of leave, legal fees, and medical expenses. *Id.* at 2. Absent is any mention of disability or a failure to accommodate it. *Id.* at 2–4.

The informal complaint does contain passing references to disability. *See generally* Informal Compl. On the cover sheet, although Roberts neglected to check the box indicating an allegation of disability discrimination, she did annotate the form with the words "Chronic autoimmune disorders, including rheumatoid arthritis; related to reprisal." *Id.* at 1, ECF No. 11-2 at 9. The allegations and desired remedies are nearly identical to those contained in the formal complaint. *Id.* at 2–4. The record also contains the Equal Employment Opportunity counselor's notes from the initial interview, conducted on December 20, 2017. ECF No. 11-2 at 15–17. In that interview, Roberts alleged that the "[h]ostile work environment, disparate treatment and harassment cause[d] stress and aggravate[d] [her] disabilities," among other complaints. *Id.* at 15. When asked how her disability played a role in the discrimination, Roberts stated that she had "documented disabilities related to auto-immune disorders and anxiety [that] were included in a prior [Equal Employment Opportunity] complaint, and continued to be affected by ongoing harassment and disparate treatment." *Id.* at 16. But when Roberts was asked why she believed that she was "discriminated against on the bas[es] [she] allege[d]," she articulated specific accounts of race and sex discrimination. *Id.* at 16–17. The only mention of disability was a passing reference to Roberts's prior administrative complaint: "The hostile work environment [Johnson] created was driven by his close relationship with individuals against who [sic] I filed a previous [Equal Employment Opportunity complaint] (partly due to disability)." *Id.* at 16.

"Generally, a plaintiff may only bring claims in district court that were actually part of the administrative charge." *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526 (D.C. Cir. 2019) (citing *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)).  But "a plaintiff may also bring claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* (quoting *Park*, 71 F.3d at 907).  "For a charge to be regarded as reasonably related to a filed charge it must at a minimum arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Id.* (internal quotation and alterations omitted).  "This connection is necessary to give the agency an opportunity to resolve the claim administratively before the employee files her complaint in district court." *Id.* (internal quotation and alterations omitted).  Materials attached to an informal complaint alone do not put the agency on notice of a claim if the formal complaint omits the same information. *See Hamilton v. Geithner*, 666 F.3d 1344, 1350 (D.C. Cir. 2012) ("Hamilton cannot rely on the [Equal Employment Opportunity] counseling report to establish exhaustion of a claim that he failed to include in his formal complaint.").

Roberts concedes that her administrative complaint contained no allegations of retaliation on the basis of disability and withdraws the count containing those allegations. *See* Resp. at 13 (withdrawing Count V).  But rather than arguing that her denial-of-accommodation allegation is somehow reasonably related to the allegations that *were* contained in the complaint, Roberts instead argues that the formal complaint actually made such allegations. *Id.* at 12–13.

When it accepted Roberts's claims for investigation, the Administrative Review Board informed Roberts that it intended to investigate

> [w]hether [Office of the Assistant Secretary for Administration and Management] managers subjected [her] to disparate treatment and a hostile work environment, and discriminated against [her] on the basis of race (black), sex (female), and *disability (immune*

> *disorders)*, and in reprisal for previous EEO . . . activity when they
> declined to consider [her] performance on an extended detail, issued
> [her] an effective rating on November 6, 2017, and changed [her]
> position description to include less responsibility and visibility, and
> tasks that lower graded employees typically performed, thus
> limiting [her] advancement to SES . . . positions.

Judge Royce's Ltr. at 1, ECF No. 8-2 at 5 (emphasis added). Seizing on the italicized language,

Roberts claims that the Board *was* aware of her failure-to-accommodate allegations and

investigated them, thus fulfilling the exhaustion requirement. *See* Resp. at 13. But the

remainder of the quotation undercuts that argument. The Board listed the alleged adverse actions

on which the discrimination was supposedly premised; none had anything to do with denial of a

request for accommodation. If anything, it appears that the Board considered Roberts's identity

as a person with disabilities merely as another basis for discrimination; in other words, it

investigated whether Johnson took any of the alleged actions *because* he had some irrational

animus against disabled persons as such. That complaint is not reasonably related to an

allegation that Johnson failed to accommodate Roberts's disabilities because the complaint gave

the Board no notice of any such request or a denial thereof.

But there is at least one indication that some other document, itself not in the record

before the Court, *did* give the Board notice of the failure-to-accommodate claim. The final

decision's introductory language tracks closely with the Board's earlier statement of the issues it

accepted for investigation; it lists "disability (immune disorders)" as one of the alleged bases for

discrimination. *See* Final Decision at 1, ECF No. 8-2 at 8. In a footnote, the Board laid out its

findings on that issue:

> To prove disability discrimination in violation of the Rehabilitation
> Act, . . . a complainant must demonstrate that he is a person with a
> disability who is qualified for and can perform the essential
> functions of the position with or without a reasonable
> accommodation, and that the agency took adverse action against him
> or failed to provide a reasonable accommodation. *In this case, you*

> *have not offered any evidence of a disability beyond claiming that*
> *your supervisor assigned you a cubicle instead of a private office*
> *and offered you full-time telework.*

*Id.* at 1 n.1 (emphasis added) (internal citations omitted).  That footnote suggests that the Board

both had notice of some request for accommodation—even if there was no mention of it in the

formal complaint—and resolved it as part of the final decision.

Unlike under Title VII, the Rehabilitation Act limits remedies to "any employee . . .

aggrieved by the final disposition of [her administrative] complaint, or by the failure to take final

action on such complaint."  *Id.*  Courts have interpreted that language to require strict

compliance with the exhaustion requirement and as depriving courts of jurisdiction over cases in

which the complainant failed to file an administrative claim.  *Spinelli*, 446 F.3d at 162 ("Such

jurisdictional exhaustion . . . may not be excused." (internal quotation omitted)).

But the fact that the Board had actual notice of the failure-to-accommodate claim

distinguishes this case from *Spinelli*, which involved a plaintiff who made no attempt to file an

administrative complaint.  In subsequent discussion of § 794a(a), the D.C. Circuit cabined

*Spinelli's* articulation of strict procedural compliance as a jurisdictional bar, instead holding that

if a plaintiff files a complaint but misses some procedural deadline required by a regulation

(rather than by the statute itself), then exhaustion of remedies may only serve as an affirmative

defense (which may be waived or forfeited) rather than a *per se* jurisdictional bar.  *See Doak*,

798 F.3d at 1103–04.  In *Doak*, the plaintiff filed an administrative complaint but did so after the

filing deadline required by EEOC regulation.  *Id.*  The Court of Appeals found that it therefore

had jurisdiction and, because the government had waived the timeliness defense, permitted the

suit to go forward.  *Id.; see also Williams v. Brennan*, 320 F. Supp. 3d 122, 127–28 (D.D.C.

2018) (synthesizing *Spinelli* and *Doak*).

Here, the Board's final decision (briefly) considered and denied Roberts's failure-to-accommodate allegations. Roberts is therefore "aggrieved" by that decision as to that issue, thus granting this Court jurisdiction to hear her claim.

## B.  Timeliness

### 1.  Discrimination

The fact that jurisdiction exists, however, does not end the exhaustion analysis. Roberts's discrimination claims fall under both the Rehabilitation Act and Title VII, but the standards for analyzing whether Roberts has exhausted administrative remedies is the same under either statute. *See* 29 U.S.C. § 794a(a)(1) (incorporating Title VII's exhaustion requirement for federal employees). The EEOC regulations implementing Title VII (and, by incorporation, the Rehabilitation Act) state that "[a]n aggrieved [federal employee] must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). Just as in the Rehabilitation Act context discussed above, "Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court." *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal quotation and alteration omitted). In this context, exhaustion is an affirmative defense rather than a jurisdictional issue, *Artis*, 630 F.3d at 1034 & n.4, so the Secretary bears the burden of demonstrating that Roberts failed to exhaust her remedies, *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).

Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the . . . time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). Roberts first approached a counselor on December 20, 2017. Under the 45-day rule in the EEOC regulation, therefore, only those discriminatory acts that occurred after November 5, 2017, were timely reported. 29 C.F.R. § 1614.105(a)(1). Roberts's formal complaint listed more than a

dozen discrete acts of discrimination and gave specific information about the date on which each occurred.  Formal Compl. at 2–4.  They included the official notification of Roberts's adverse performance evaluation (November 6, 2017); formal notice of her position-description modification (October 20); tentative notice of the adverse evaluation and harassment for communicating with a human resources representative (October 10); initial notification of the intent to modify Roberts's position description (September 21); exclusion of African-American employees from an email chain (September 13); Johnson's admission that he neglected to share Roberts's proposal for shifting her position to another office with senior leaders (August 10); Johnson's refusal to share notes from a meeting with Roberts (July 26); Johnson's direction that Roberts take actions she knew to be contrary to his supervisors' direction (July 26); and Johnson's direction to employees not to invite Roberts to an office-wide meeting (July 13). Formal Complaint at 2–4.  Notably, none of these allegations involves any denial of a request for a disability accommodation, so even though the Court has jurisdiction over that claim, *see supra* Section IV.A, it is still barred for a failure to exhaust.

Of the incidents listed in the formal complaint, only one falls within the required time period:  delivery on November 6, 2017, of the allegedly adverse performance evaluation. Roberts could have approached a counselor after any one of the earlier events, but she chose to wait until the deadline had passed for most of the allegedly discriminatory acts.  Roberts cannot now premise her claims for sex, race, or disability discrimination or retaliation on any of the discrete events that occurred before November 5.  She may "us[e] the prior acts as background evidence in support of a timely claim" at summary judgment or beyond, but none may form the basis of a facial claim of discrimination under either Title VII or the Rehabilitation Act at this stage because Roberts did not timely exhaust administrative remedies.  *Morgan*, 536 U.S. at 113.

### 2.   Hostile Work Environment

Every count in the Complaint alleges both discrete actions and a general allegation of a hostile work environment to support the various theories of discrimination and retaliation. Compl. ¶¶ 63, 67, 70, 74.  "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct."  *Morgan*, 506 U.S. at 115.  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability."  *Id.* at 117.  At least one act on which Roberts bases her hostile environment claim (the performance evaluation) occurred within the reporting window, and she raised a hostile work environment allegation to the agency, so she has exhausted her remedies on that claim.  Even though Roberts may not base her claims for discrimination on the discrete events that occurred outside the filing window, she may use those allegations to support a claim for hostile work environment in each count.  *See id.* at 122 (permitting plaintiff to proceed on hostile work environment claim even though he failed to timely exhaust remedies on his discrimination and retaliation claims).

### 3.   Retaliation

Before the events at issue in this case, Roberts filed an Equal Employment Opportunity complaint with the Labor Department in 2016.  Compl. ¶ 11.  The complaint had nothing to do with Johnson or Hugler; Roberts alleged instances of gender and race discrimination against other managers in her office but withdrew the complaint in December 2016 when those managers left the Department.  *See* EEO Counselor's Notes of Jan. 10, 2018, ECF No. 11-2 at 20.  Nevertheless, Roberts alleges that Johnson and Hugler were aware of the earlier complaint and held it against her, providing additional motivation for their engaging in the discriminatory acts that occurred in 2017.  *Id.*; Compl. ¶ 12.

Unlike with discrete acts of discrimination, discrete acts of retaliation relate back to the victim's exercise of protected rights in the past.  In some sense, every act of retaliation is part of an ongoing reprisal for earlier protected activity, so it is conceivable that the question of timeliness as to exhaustion of retaliation claims might occupy some middle ground between the strict rule that *Morgan* established for discrete incidents of discrimination and the continuous-violation standard for hostile work environment claims.  The Supreme Court had no occasion to apply the timeliness requirement to allegations of retaliation in *Morgan*; that case focused solely on the differences in the rule's application between discrete incidents of discrimination and discriminatory hostile work environment claims.  536 U.S. at 110–21.

Without guidance from the Supreme Court, "[c]ourts in this district do not apply the 45-day requirement to discrete acts of retaliation . . . in a uniform way. Some impose the requirement on each discrete act of retaliation that forms the basis of a plaintiff's claim in federal court regardless of any relationship that exists between those discrete claims and any others; others decline to apply the requirement to discrete acts of retaliation when they are related to discrimination claims that were in fact presented to an [Equal Employment Opportunity] officer." *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 11 (D.D.C. 2019) (collecting cases) (internal quotations omitted).  "The Circuit has repeatedly declined to opine on which approach is correct." *Id.* (collecting cases).[5]

A sizeable majority of judges in this district has adopted the strict view and requires plaintiffs to file an administrative complaint within 45 days of each alleged retaliatory action.

---

[5] There is also a circuit split on the question, with the Tenth Circuit using the strict approach and the Fourth, Fifth, Sixth, and Eighth Circuits and (and district courts in at least the Seventh and Ninth Circuits) being more lenient.  *See Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 273 n. 1 (5th Cir. 2013) (collecting cases).

*See Tyes-Williams*, 361 F. Supp. 3d at 11; *see also Mount v. Johnson*, 36 F. Supp. 3d 74, 85–86 (D.D.C. 2014) (collecting cases). The Court agrees with this approach because it is more consistent with *Morgan*, which emphasizes strict compliance with filing deadlines. 536 U.S. at 114 (critiquing the "serial violation" approach and commenting that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice" (internal quotation omitted)). Moreover, "requiring exhaustion encourages internal, less costly resolution of Title VII claims." *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005).

Just as Roberts failed to exhaust administrative remedies in a timely fashion as to most discrete incidents and therefore may not use them as the basis for her discrimination claims in Counts I, II, and IV, she is also precluded from using the same incidents to form the basis of her retaliation claim in Count III.[6]

### C. Failure to State a Claim

Once the unexhausted portions of Roberts's claims are removed, here's what's left: Roberts alleges that her supervisors at the Department of Labor discriminated and retaliated against her on the basis of race, sex, and disability when they issued her an adverse performance evaluation and created a hostile work environment (exhibited by several adverse incidents). *See*

---

[6] Roberts's Response brief ignores the split and cites to a blanket statement in *Moore v. Pritzker*, which observed that "[f]or a claim of retaliation, a plaintiff is permitted to combine acts committed over a period of years, including acts by different supervisors, into a single actionable claim." 204 F. Supp. 3d 82, 90 (D.D.C. 2016) (citing *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 82 (D.D.C. 2013)). *Moore* did not involve questions of timeliness; it instead considered whether plaintiff had *ever* reported the incidents administratively or whether they were reasonably related to other incidents she did report. *Id.* And *Bergbauer* was about hostile work environment claims, which follow a different rule altogether. *See* 934 F. Supp. 2d at 82; *see also infra* Section IV.B.3. Neither case compels an alternative result here.

Case 1:19-cv-00474-CJN   Document 15   Filed 04/16/20   Page 19 of 22

*generally* Compl.  The Secretary argues that the Complaint fails to allege enough facts to support

either allegation.  Mot. at 12–15, 19–21.

### 1.    Hostile Work Environment

The Secretary contends that Roberts has not plausibly alleged a hostile work

environment.  To be actionable, such an environment must be "permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and alterations omitted).  "To determine

whether a hostile work environment exists, the [C]ourt looks to the totality of the circumstances,

including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether

it interferes with an employee's work performance."  *Baloch v. Kempthorne*, 550 F.3d 1191,

1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

But even after the Secretary stepped through each allegation to show why, together, they

do not add up to a hostile environment, *see* Mot. at 12–15, Roberts neglected to respond to *any*

of the Secretary's arguments, *see* Resp. at 16–19.  Although Roberts has adequately explained

how she had *exhausted* the claim, she has provided no explanation for why the things that

allegedly happened to her qualify as a hostile work environment.  *Id.*  She has therefore conceded

the argument.  *Kone v. District of Columbia*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011).

### 2.    Performance Evaluation

The final question is, then, whether Roberts's November 6, 2017 performance evaluation,

on its own, constitutes an act of illegal discrimination (Counts I, II, and IV) or retaliation (Count

III).  To recap the relevant allegations, Roberts exhibited "exceptional performance" while on

detail to the EPA in a Senior Executive Service-level position.  Compl. ¶ 29.  During her detail,

Roberts reported back to Johnson to keep him informed about her activities.  *Id.* ¶ 40.  After her

return, Roberts objected to the planned position-description change to Johnson, to the Acting

Deputy Assistant Secretary, and to human resources. *Id.* ¶¶ 33–35.  A few days later, Johnson

learned of Roberts's complaints to human resources and told her that he would be lowering her

score on her next evaluation and that he would refuse to consider her performance at EPA. *Id.*

¶ 38.  The following month, Johnson delivered the evaluation to Roberts—it reflected his earlier

threats. *Id.* ¶ 51.  Roberts also alleges that the evaluation of other, similarly situated personnel

included information about their performance while detailed elsewhere. *Id.* ¶ 46.  Roberts

believes that the adverse evaluation was both discriminatory (because of her membership in

protected categories) and retaliatory (in reprisal for her previous administrative complaints and

her informal communications with both Acting Deputy Assistant Secretary Stewart and human

resources representatives). *Id.* ¶¶ 62–76.

*Discrimination.*  "[T]he two essential elements of a discrimination claim are that (i) the

plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion,

sex, national origin, age, or disability." *Baloch*, 550 F.3d at 1196.  The Secretary challenges

both prongs and focuses, for the purposes of this Motion, on whether the evaluation qualifies as

materially adverse. *See* Mot. at 20–21.  "Materially adverse actions usually involve 'a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in

benefits.'" *Spector v. District of Columbia*, CA No. 1:17-cv-1884, 2020 WL 977983, at *11

(D.D.C. Feb. 28, 2020) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

The same rules apply to performance evaluations—they must "affect the employee's

position, grade level, salary, or promotion opportunities" to qualify as materially adverse. *Id.* at

*13 (quoting *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009)).  The key factor

distinguishing cases in which evaluations are found to be materially adverse and those in which

they are not seems to be whether some financial or professional harm flows directly from the

evaluation itself.  In *Spector*, for example, the plaintiff could not demonstrate any harm resulting

from receiving a lower score on her annual assessment.  *Id.*  The same was true in *Taylor*, 571

F.3d at 1321, and *Baloch*, 550 F.3d at 1199.  On the other hand, the D.C. Circuit has held that

merely assigning an employee an "average" rating—the same rating the plaintiff had received

the prior year—can qualify as materially adverse when paired with an allegation that the rating

"made it unlikely [that plaintiff] would receive a discretionary bonus."  *Walker v. Johnson*, 798

F.3d 1085, 1090 (D.C. Cir. 2015); *see also Moore*, 204 F. Supp. 3d at 87–88, 92 (finding

material adversity when employee's score on a performance evaluation directly determined the

amount she received on her year-end bonus).

　　　Roberts's Complaint is woefully deficient on this front.  It alleges simply that "Plaintiff

has suffered and will continue to suffer a loss of earnings and other employment benefits and job

opportunities" as a result of *all* the alleged discrimination, not just the evaluation.  Compl. ¶ 68.

The Complaint contains no allegation of specific harm tied to the evaluation itself, and when the

Secretary pressed the issue, Roberts again neglected to respond to the argument.  *See* Resp. at

15–18.  Having exerted all her efforts on the question of exhaustion, Roberts did not bother to

engage the Secretary on this or, frankly, any of the Secretary's substantive arguments.  *Id.*  A

"bare, conclusory allegation that [plaintiff] was denied promotion and bonus opportunities" is

insufficient to state a claim for discrimination.  *Taylor*, 571 F.3d at 1321.  Roberts conceded her

opportunity to develop her claim.  *Kone*, 808 F. Supp. 2d at 83.

　　　*Retaliation.*  The bar for retaliation claims is normally lower than it is for discrimination

claims.  "[A] plaintiff must show that a reasonable employee would have found the challenged

action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted).  "[T]he significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.  But the D.C. Circuit has repeatedly held that some tangible harm must attach to evaluations to make them materially adverse, even under the easier standard for retaliation.  *See Taylor*, 571 F.3d at 1321; *Baloch*, 550 F.3d at 1199; *Weber v. Battista*, 494 F.3d 179, 185–86 (D.C. Cir. 2007).  As noted above, the Complaint is devoid of any allegation of tangible harm and Roberts has conceded her opportunity to develop the allegation further.  *Kone*, 808 F. Supp. 2d at 83.

### V.      Conclusion

Roberts alleges that she experienced several discriminatory and retaliatory actions in 2017, but she failed to bring most of them to the Department's attention within the allowed timeframe.  Some of her allegations were timely reported, but she neglected to respond to the Secretary's substantive arguments as to why she fails to state a claim.  For those reasons, it is hereby

**ORDERED** that the Secretary's Motion to Dismiss is **GRANTED**.  The Complaint is **DISMISSED**.  An Order will be issued contemporaneously with this Memorandum Opinion.


DATE:  April 16, 2020

CARL J. NICHOLS
United States District Judge